Andrew M. Calamari
**REGIONAL DIRECTOR**
Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)
Email:  FischerH@SEC.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | Civil No. |
| Plaintiff, : | |
| : | ECF CASE |
| : | |
| -against- : | COMPLAINT AND JURY |
| : | DEMAND |
| MICHAEL QUIGLEY and BRIAN QUIGLEY, : | |
| : | |
| Defendants. : | |

---

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Michael Quigley and Brian Quigley ("Defendants"):

### SUMMARY OF ALLEGATIONS

1.      This case involves a fraudulent securities offering scheme conducted by defendants Michael Quigley and Brian Quigley, together with their brother, William Quigley.

2.      Defendants solicited investors to invest in various securities, including well-known "blue chip" issuers as well as investment funds and one or more penny stock "start-up" companies that supposedly were on the verge of going public. Michael Quigley and Brian Quigley never purchased any of the offered securities for the investors, and the claims of imminent public offerings were lies. All of the investors' funds, totaling at least $855,000, were

misappropriated by the Quigleys.

3.      As part of the scheme, Defendants instructed several investors to wire their investment funds to various bank and brokerage accounts, including U.S. bank and brokerage accounts that William Quigley set up. Defendants issued phony brokerage statements to certain investors purportedly showing that they had growing account balances. When investors tried to liquidate the securities they had been led to believe they owned, Defendants made one excuse after another as to why their funds, which had already been stolen, could not be returned to them.

## VIOLATIONS

4.      By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

5.      For these violations, the Commission seeks a final judgment against Michael Quigley ordering permanent injunctive relief, disgorgement with prejudgment interest, civil monetary penalties, a penny stock bar and such other relief as the Court deems just and proper, and a final judgment against Brian Quigley ordering permanent injunctive relief, a penny stock bar and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to authority conferred by Sections 20(b), 20(d), and 20(g)(1) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77t(g)(1)], and Sections 21(d)(1), 21(d)(3), and 21(d)(6)(A) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3), and 78u(d)(6)(A)].

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(g), 22(a), and 22(c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(g), 77v(a), 77v(c)]; and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Many of the acts, practices, events, transactions, communications, courses of business and other matters alleged herein occurred in the Eastern District of New York, including the misappropriation of investor funds from accounts opened by William Quigley for the purpose of receiving and then funneling investor funds to Defendants and himself.

9.       In connection with the conduct alleged in this Complaint, Michael Quigley and Brian Quigley, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

## DEFENDANTS

10.     **Michael Quigley** is 47 years old. He was a registered representative associated with a registered broker-dealer from April 1999 through November 2002, and held Series 7 and Series 66 licenses. He resided in the Philippines during the relevant period and, upon information and belief, may still reside there.

11.      **Brian Quigley** is 44 years old. After living in the Philippines for several years,

Brian Quigley returned to the United States in 2017 and, upon information and belief, is

currently living in East Windsor, New Jersey. He was a registered representative associated with

a registered broker-dealer from July 1995 through April 1999, and, during that time, he had

reportable disclosures involving allegations of conversion, unsuitable investments, and churning.

## RELEVANT INDIVIDUALS AND ENTITIES

12.      William Quigley was Director of Compliance of Trident Partners Ltd. ("Trident"),

a registered broker-dealer in Long Island, New York, from June 2004 through September 2005

and again from October 2007 until September 2014. At all relevant times, he was a resident of

Seaford, New York.  William Quigley is Defendants' older brother. On May 28, 2015, the

Commission instituted administrative and cease-and-desist proceedings pursuant to Section 8A

of the Securities Act and Sections 15(b) and 21C of the Exchange Act against William Quigley

("William Quigley AP"), based on many of the same allegations contained herein. On March 24,

2016, in a parallel criminal action filed in the Eastern District of New York by the United States

Attorney's Office for the Eastern District of New York, William Quigley pleaded guilty to a

charge of Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349, based on conduct alleged in the

William Quigley AP.  On October 26, 2016, William Quigley was sentenced to 6 months of

incarceration and 3 years of supervised release with 12 months of home confinement, and was

ordered to forfeit $356,891. *United States v. William Michael Quigley*, 15-CR-258 (JMA). On

March 24, 2017, the Commission entered, with William Quigley's consent, an order (1) directing

William Quigley to cease and desist from committing or causing the violations found in the

order; (2) imposing securities industry associational and penny stock bars; and (3) requiring

disgorgement in the amount of $356,891, deemed satisfied by the forfeiture order in the criminal

case. *In the Matter of William Quigley*, Securities Act Release No. 10327, 2017 WL 1103692 (March 24, 2017).

13.     Trident is a broker-dealer registered with the Commission since 1996. Trident's principal place of business is located in Woodbury, New York. Trident terminated William Quigley as its Director of Compliance in September 2014.

**DEFENDANTS' FRAUDULENT CONDUCT**

**Overview of the Scheme**

14.     From at least 2003 through the latter part of 2012, Michael Quigley and Brian Quigley repeatedly duped at least four unsophisticated foreign individuals, including elderly individuals, into sending funds to various U.S. bank and brokerage accounts for purported investments in the securities of publicly traded companies, investment funds and private start-up companies supposedly slated to go public. Defendants claimed to be associated with numerous non-existent entities, including fictional broker-dealers, and claimed to have various colleagues at these firms (using phony names such as James Morris) who appear to have been invented by them as well. Defendants never invested or purchased securities with any of the investors' funds. Instead, Defendants and their brother William Quigley simply stole the funds.

15.     Michael Quigley and Brian Quigley used virtually every trick in the book to defraud investors, including sending phony account statements; using a fake firm name similar to the name of an existing firm; making up numerous phony excuses for their failure to return funds; manufacturing stock certificates; falsely claiming on various occasions to be helping the investor recover previous losses; requiring payment of bogus transfer agent fees purportedly to obtain the investors' stock certificates; and other scams. Indeed, Brian Quigley and Michael Quigley repeatedly managed to extract funds from at least four investors for over a decade, by

creating new stories and schemes.

16.     Michael Quigley and Brian Quigley often persuaded investors to deposit their funds into brokerage accounts set up and controlled by William Quigley. Upon deposit, the funds were not invested, but stolen by the Quigleys.

17.     When the investors tried to get their money back, Michael Quigley and Brian Quigley made up various excuses and often used the opportunity to defraud the investors out of additional funds. Brian Quigley even told one investor that the fictitious "James Morris," with whom Brian Quigley was supposedly working to invest the investor's funds, had died in a motorcycle accident and therefore could not be contacted about the investment.

18.     In his criminal guilty plea, William Quigley admitted that from January 2003 through November 30, 2012, he (i) engaged with two other individuals in a scheme to defraud investors by inducing them to transfer funds for the purported purchase of securities; (ii) opened several accounts into which such investor funds were transferred; and (iii) the investor funds were not used to purchase securities but were instead either transferred to his co-conspirators in the Philippines or kept by him for his personal use.

**The Early Years of the Scheme**

19.     From as early as 2003 and until at least as late as the end of August 2012, Michael Quigley repeatedly lied to investors in emails and telephones calls. He initially held himself out as a successful broker at the fictitious firm "Southwest Private Equity." By December 2004, Michael Quigley told investors that he had moved to a new firm called "Advantages Securities Group" as a "Personal Broker." While "at" the Southwest and Advantages firms, he purported to sell investors shares in private companies, claiming that the investors would soon get large returns when the companies went public. Those shares included warrants for the purchase of

additional shares. These companies never went public, and there is no evidence that an initial
public offering was actually contemplated or feasible.

**2006-2012**

20.    By 2006, Michael Quigley told investors that he had moved to a new brokerage
firm called "Trident Partners Investment Group," purportedly an NASD-registered brokerage
firm, supposedly located in Jericho, New York. No such firm was registered with FINRA or
incorporated in any state; however, the name is confusingly similar to the name of William
Quigley's actual employer at the time, Trident. Defendants thereafter directed investors to send
funds to various brokerage accounts, including three accounts that were opened and controlled
by William Quigley within the Eastern District of New York and from which the investors'
money was misappropriated by the Quigleys in various ways.

21.    While claiming to be at "Trident Partners Investment Group," Michael Quigley
and his fictitious associate "James Morris" lied to investors about the supposed imminence of the
previously promised public offerings of at least one penny stock start-up company and conned
the investors into purportedly exercising their warrants in the soon-to-be-public company,
thereby extracting additional bogus fees from the investors. As described in more detail below,
Michael Quigley and Brian Quigley also fraudulently persuaded investors to send them funds for
a wide range of other phony investments, including blue-chip companies, well known mutual
funds and a little known publicly traded penny stock company.

22.    Michael Quigley further deceived investors by sending them fake brokerage
statements showing that the supposedly purchased securities were held in individual brokerage
accounts housed at "Trident Partners Investment Group," and that the balances were purportedly
growing. In the phony account statements, Michael Quigley also falsely represented to investors

that their accounts were protected by the Securities Investor Protection Corporation, and that the firm was a member of the National Association of Securities Dealers.

**Accounts Set Up by Defendants' Brother William Quigley**

23.     As part of Defendants' scheme to defraud investors, Defendants instructed investors to wire their investment funds to U.S. bank and brokerage accounts that William Quigley created within the Eastern District of New York for this purpose. These accounts were used by Defendants to obtain, funnel, dissipate, and otherwise steal investor funds, and the accounts had no purpose other than to further their fraudulent scheme.

24.     One of these three accounts was kept at Trident, as a "house account" in the name of Funding Group, Inc. ("House Account"). As a "house account," the activity in the account was reviewed only by William Quigley and not by the registered representatives at Trident. The other two accounts, one in the name of Funding Group Inc. ("Funding Group Account") and the other in the name of Trident Partners Investment Club ("TPIC Account"), were opened at a New York-based discount brokerage firm using post office box addresses located in the Eastern District of New York.

**Defendants' Use of the Three Accounts to Obtain and Steal Investor Funds**

25.     Hundreds of thousands of dollars of investor funds were deposited in the three accounts described above. A significant portion of the investor funds were subsequently transferred to Brian Quigley and Michael Quigley in the Philippines, much of it via electronic transfers, including from the Funding Group Account and the House Account.

26.     Defendants instructed investors to wire funds to all three of the subject accounts supposedly for the purchase of securities, but no investments were ever made. Instead, all of the money deposited into these three accounts was almost immediately wired out to a bank in the

Philippines, otherwise diverted for the benefit of other Quigley family members or else quickly
withdrawn in small amounts (almost always in increments of $500) from ATM machines in the
vicinity of William Quigley's home and office in the Eastern District of New York.

**Defendants' Specific Misrepresentations to Four Investors**

27.     The information set forth below details the misrepresentations and other
fraudulent means through which Defendants induced at least four of their investor victims to
wire money to the accounts set up by William Quigley, from which the money was then
misappropriated.

**Investor A**

28.     Investor A lost a total of $230,000 to Defendants' schemes. The following are
examples of deceptions employed by Michael Quigley to defraud Investor A from 2003-2012. In
each instance, as described below, Investor A sent funds to one of the three accounts that
William Quigley set up to further Defendants' scheme.

29.     In June 2006, Michael Quigley persuaded Investor A to open up a new brokerage
account at the fictitious "Trident Partners Investment Group." From June through December,
2006, Investor A sent $10,000 to the TPIC Account after Michael Quigley told Investor A that
these funds were going to be used to buy bonds. Michael Quigley never intended to buy bonds
with the funds and instead simply stole Investor A's money. In January 2007, Michael Quigley
emailed a phony account statement to Investor A from Trident Partners Investment Group,
reflecting his fictitious bond holdings as well as $500 of fictitious interest on the bonds. The
phony account statement falsely stated that Trident Partners Investment Group was a "Member
NASD, SIPC, MSRB." Michael Quigley also falsely told Investor A in emails that this
investment was "safe" and "completely insured" and that the bonds were being converted into a

"FDIC Insured Certificate of Deposit."

30.     In mid-2007, Michael Quigley fraudulently induced Investor A to exercise phony warrants in a soon-to-be-public company, which had common stock priced below $5 per share at the time, that Michael Quigley had previously purported to sell to him. Among other things, Michael Quigley emailed a letter to Investor A, supposedly from the president of Trident Partners Investment Group, describing the warrant exercise opportunity as a "limited offer" and "no risk." From September 2007 through January 2008, Investor A wired more than $25,000 to the TPIC Account for these warrants. Michael Quigley never intended to obtain or exercise warrants for Investor A and instead simply stole the investor's money.

31.     In late 2009, Michael Quigley pitched Investor A on a phony investment in funds and, on his instructions, Investor A sent $4,983 to the House Account, which William Quigley had just opened at Trident. From February through April 2009, Investor A sent about $15,000 more to the House Account for the phony fund purchase that Michael Quigley had fraudulently pitched to him. Michael Quigley never intended to invest Investor A's money in funds and instead simply stole the investor's money.

32.     In May 2010, William Quigley emailed Michael Quigley information describing a fund and stated in the email, "Should be an easy sell." On the following day, Michael Quigley began to pitch Investor A on a phony investment in a similarly-named fund. From May through October, 2010, Investor A sent three wires totaling more than $27,200 for this phony fund investment to the House Account. Michael Quigley never intended to invest Investor A's money in any such fund and, once again, simply stole the investor's money. Michael Quigley continued to defraud Investor A in this manner through at least August 30, 2012.

33.     On November 25, 2010, Michael Quigley emailed Investor A with "exciting

news" that two employees of a soon-to-be-public company were willing to buy his shares. He told Investor A that he needed to send a "transfer re registration fee of $12,678 . . . ASAP." These statements were false. On November 30, 2010, Investor A wired this money to the House Account.

34.     From February 2011 through at least August 30, 2012, Michael Quigley fraudulently induced Investor A to wire another $82,000 to the Funding Group Account by making further misrepresentations about additional supposed investments, which were also phony and which funds were also misappropriated.

35.     Investor A received another phony "Trident Partners Investment Group" account statement in August 2012, which stated that the broker was "Michael J. Quigley" and showed a "total asset value" of $486,694, including a CD, fund shares and other purported investments described above. Investor A did not really own any of these securities, as Michael Quigley and his brother William Quigley had simply stolen all of the money that Investor A wired to the accounts set up by William Quigley. Nevertheless, on August 12, 2012, Michael Quigley directed, via email, Investor A to wire an additional $18,139 to the Funding Group Account for additional fictitious investments. On August 26, 2012, Michael Quigley emailed Investor A additional wire instructions for Investor A to use to transfer these additional funds to the Funding Group Account for additional fictitious investments. Investor A's transfer of the funds occurred on August 30, 2012. Michael Quigley also stole those funds, which were steadily withdrawn in increments of approximately $1,000 throughout September 2012. The Funding Group Account was regularly accessed online from the Philippines throughout this period.

**Investor B**

36.     Investor B lost $72,000 to Defendants' fraudulent schemes. From 2003 through 2012, Michael Quigley purported to sell to Investor B shares of soon-to-be-public companies, including at least one company with common stock priced below $5 per share. A portion of Investor B's funds were wired to the accounts controlled by William Quigley. In August 2007, Investor B sent about $5,000 to the TPIC Account; in May and September of 2010, Investor B wired about $4,700 to the House Account. Investor B made these transfers after Michael Quigley falsely told him that the funds would be used to purchase shares of soon-to-be-public companies. All of Investor B's funds were then misappropriated by Defendants.

**Investor C**

37.     Investor C lost at least $50,000 as a result of Defendants' fraudulent schemes. During the relevant time period, Investor C's main Quigley-related contact was an individual he knew as "James Morris" of the fictitious Trident Partners Investment Group. Described below are some examples of the ruses used by "Morris" to get Investor C to send money for phony securities investments to an account managed by William Quigley, through which it was then misappropriated.

38.     In 2006, "Morris" initially ingratiated himself to Investor C by claiming he could help Investor C recover money he had lost in an earlier scam. "Morris" later told Investor C that he had located some of the "lost" shares Investor C thought he had purchased and, in June 2006, persuaded Investor C to send $4,980 to the TPIC Account for "registration fees" related to the reissuance of these fictitious shares. The statements made by "Morris" were false and Investor C's money was stolen by the Quigleys.

39.     In late November 2006, "Morris" fraudulently offered Investor C the opportunity

12

to have a purported "Wealth Management account" at Trident Partners Investment Group, and

told Investor C that "Morris" would need $50,000 to fund the account. These statements made by

"Morris" were false.  In December 2006, Investor C sent more than $25,000 to the TPIC

Account for this purpose, and "Morris" then falsely told Investor C that the funds were used to

purchase shares of publicly traded companies. In fact, Investor C's money was, once again,

stolen by the Quigleys.

   40. In July 2007, "Morris" fraudulently induced Investor C to wire $13,300 to the

TPIC Account to exercise fake soon-to-be-public company warrants that "Morris" had

purportedly sold to him earlier. In fact, Investor C's money was, once again, stolen by the

Quigleys.

   41. "James Morris" also sent Investor C a fake Trident Partners Investment Group

account statement -- the same phony firm from which Investor A received (via Michael Quigley)

an account statement identifying Michael Quigley as the broker -- listing "James Morris" as

Investor C's broker and listing the account number of one of the accounts set up by William

Quigley to carry out the scheme.

   42. In August 2010, Investor C requested a distribution from this account.  "Morris"

told him that he would have to pay $7,000 to liquidate holdings. Investor C sent this amount to

the Funding Group Account. Investor C never received a penny from his "account" and never

heard from "Morris" again.

**Investor D**

   43. Investor D lost about $530,000, beginning in 2003, to Defendants' fraudulent

scheme.

   44. In 2010, the same so-called "James Morris" and Brian Quigley fraudulently

solicited Investor D to make a purported $100,000 investment in a company quoted on the Over-the-Counter ("OTC") markets. In a March 2010 email that "Morris" sent to Investor D, Brian Quigley is said to have identified this purported investment opportunity, using a slightly different variation of the company's name. A February 2010 email written by Brian Quigley and copied to Michael Quigley had attached information about this OTC company and stated that "[t]his should answer product specific questions." Investor D sent his $100,000 for an investment in the OTC company to the Funding Group Account. During this time, the market price of the OTC company was approximately $1.90 per share and remained below $5 throughout the relevant time.

45.     None of Investor D's money was ever invested, and most of it was immediately wired out of the Funding Group Account to a bank in the Philippines. Much of the rest was withdrawn in small amounts from ATMs in close proximity to William Quigley's office at Trident in Long Island. During this same period, William Quigley wired about $42,000 in small increments from various Western Union locations in Long Island to the Philippines, frequently specifying Michael Quigley or Brian Quigley as the recipient of such funds.

46.     In fall 2010, "Morris" sent Investor D documents purporting to evidence Investor D's investment in the OTC company, including a phony stock certificate and an unexecuted promissory note. Realizing that the promissory note was not signed, Investor D contacted the actual company named in the stock certificate and was informed by the company's CEO that the stock certificate was bogus (it had a forged signature and identified the wrong transfer agent). The CEO also told Investor D that the company had never received any of the monies Investor D thought he had invested. After Investor D complained to "Morris," Investor D received a bogus letter from the "Senior Risk Officer of the Funding Group," apologizing and falsely telling

Investor D that the Funding Group was replacing his investment with 6,000 shares of an equity fund.

47.     Investor D made one further purported investment as a result of Defendants' scheme, sending another $14,000 to the Funding Group account in February 2011. Investor D sent this money in response to an email from "Morris" falsely representing that Investor D could sell his shares in a soon-to-be-public company (with common stock priced below $5 per share) for a total of $952,196, but first needed to pay a $14,000 "transfer fee." He never heard from "Morris" again.  In an effort to find "Morris," Investor D reached out to Brian Quigley in early 2011. In May 2011, Brian Quigley emailed Investor D in furtherance of the scheme, lying as follows:  "Regarding Mr. Morris, I am sorry to inform you that we have heard that [he] was killed in a motorcycle accident some months ago. We are actually looking for an address where we could send our condolences. When we find one, we will send it to you as well." Investor D never received the $952,196 or any other return on his purported "investments." All of his funds were stolen by the Quigleys.

48.     Based on the foregoing, including the fact that "James Morris" directed investors to send funds to the same accounts to which Michael Quigley and Brian Quigley directed investors to send funds, "James Morris" actually was, on information and belief, an alias used by either Michael Quigley or Brian Quigley, or by both of them and/or by another individual with whom Defendants acted in concert to perpetrate the fraudulent scheme described above.

49.     Based on the foregoing, Defendants were, at the time of the misconduct alleged above, participating in the offering of penny stocks, as such stocks are defined in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder, by virtue of Defendants having engaged in activities for purposes of the purported issuance or trading, and/or inducing or

attempting to induce the purported purchase or sale of, a penny stock.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Both Defendants)

50.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49.

51.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means of instruments of transportation or communication in interstate commerce, knowingly, recklessly, or negligently have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

52.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Both Defendants)

53.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49.

54.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate

16

commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

55.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining both Defendants from committing the violations of the federal securities laws alleged in this Complaint;

### II.

Ordering Michael Quigley to disgorge the ill-gotten gains he obtained as a result of the violations alleged in this Complaint, and ordering him to pay prejudgment interest thereon;

### III.

Ordering Michael Quigley to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Prohibiting both Defendants from participating in an offering of penny stock pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the

Exchange Act [15 U.S.C. § 78u(d)(6)(A)]; and

**V.**

Granting such other and further relief as the Court may deem just and proper.

<u>**JURY DEMAND**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated: New York, New York
      August 10, 2017

Respectfully submitted,

Andrew M. Calamari
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Howard A. Fischer, Senior Trial Counsel
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@SEC.gov

<u>Of Counsel:</u>
Sanjay Wadhwa
George N. Stepaniuk
Michael Paley
Chevon Walker